UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WELLINGTON SHIELDS & CO. LLC,

Plaintiff,

-v-

BREAKWATER INV. MGMT. LLC, *et uno*,

Defendants.

No. 14-cv-7529 (RJS)
OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge:

Plaintiff Wellington Shields & Co. LLC ("Wellington") brings this action against

Defendants Breakwater Investment Management LLC ("Breakwater") and Saif Mansour,

Breakwater's managing partner (collectively, "Defendants"), alleging tortious interference with

contract and tortious interference with prospective economic relations involving non-party Bleach

Pty. Ltd. ("Bleach").  Now before the Court is Defendants' motion for summary judgment on all

of Plaintiff's claims.  For the reasons that follow, Defendants' motion is granted.

I. BACKGROUND[1]

Wellington is an investment bank with its principal place of business in New York.

Breakwater is a private investment firm with its principal place of business in California.  (Def.

56.1 ¶¶ 1,2.)  Bleach was an Australian owner and operator of apparel brands marketing to surfing

---

[1] The following facts are generally taken from Defendants' Local Civil Rule 56.1 Statement (Doc. No. 47 ("Def. 56.1")) and Plaintiff's response (Doc. No. 59 ("Pl. 56.1 Counter")), the affidavits and declarations submitted in connection with Defendants' motion, and the exhibits attached thereto.  Unless otherwise noted, where one party's 56.1 Statement is cited, the other party does not dispute the fact asserted, has offered no admissible evidence to refute that fact, or merely objects to inferences drawn from that fact.  In deciding the present motions, the Court also considered Defendants' memorandum of law in support of their motion for summary judgment (Doc. No. 48 ("Def. Mem.")); Plaintiff's memorandum of law in opposition to Defendants' motion for summary judgment (Doc. No. 55 ("Pl. Opp.")); and Defendants' reply in further support of its motion for summary judgment (Doc. No. 65 ("Def. Reply")).

and skating activities and fashions.  (*Id.* ¶ 4.)  Bleach entered liquidation in Australia in 2013.  (*Id.* ¶ 35.)

On or about November 8, 2011, Wellington executed an engagement letter (the "Engagement Letter") with Bleach to provide Bleach with certain investment banking services, including to serve as an underwriter for a contemplated initial public offering ("IPO") and to locate interim bridge financing.  (Doc. No. 46, Declaration of Daniel C. Green, dated July 27, 2015 ("Green Decl."), Ex. C.)  The Engagement Letter provided that Wellington would receive a "success fee" of 10% of the amount of any bridge financing and 7% of the amount raised in the IPO.  (*Id.*)  The duration of the agreement was twelve months, although Plaintiff could also be entitled to fees from Bleach on additional transactions that closed after the twelve-month period if "conversations between [Bleach] and the Buyer/Seller" were ongoing at the close of the twelve-month period.  (*Id.*)  According to the Engagement Letter, the fees would be calculated according to an industry standard known as the "Lehman Formula," with Wellington receiving a minimum fee of $200,000.  (*Id.*)  *See, e.g.*, *Lehman v. Dow Jones & Co.*, 783 F.2d 285, 288 (2d Cir. 1986). Finally, Wellington was given preferential rights "to provide any financing arrangements to [Bleach]" for a period of eighteen months after the closing of any transaction or placement that occurred within the term of the Engagement Letter.  (Green Decl., Ex. C.)

Notwithstanding the foregoing, the introductory paragraph of the Engagement Letter expressly stated that:  "[Wellington is] pleased to submit the following proposal with respect to the public offering by Bleach . . . along with a $1.5 million bridge financing. . . . It is our intent, immediately prior to the Effective Date, to enter into an exclusive, firm commitment Underwriting Agreement."  (*Id.*)  The Engagement Letter also provided that it did not create "any obligation" between the parties and that the Engagement Letter "is merely a statement of intent."  (*Id.*)  Finally,

while the letter stated that Wellington "will remain committed to entering into this agreement provided it is executed by [Bleach] on or before November 7, 2011," the Engagement Letter was dated and signed by both Bleach and Wellington on November 8, 2011.  (*Id.*)

Wellington subsequently approached Breakwater about providing bridge financing for Bleach, and in or around January 2013, Breakwater Structured Growth Opportunities Fund L.P. (the "Fund") – a fund for which Breakwater serves as general partner – provided a loan to Bleach Group, Inc. ("BGI"), a Delaware entity formed by Bleach for the purpose of holding certain assets in connection with its IPO.  (Def. 56.1 ¶ 12.)  The Fund provided $2.65 million in bridge financing to BGI in exchange for $3.6 million in subordinated secured debt.  (*Id.* ¶ 15.)  Wellington was paid a success fee in connection with this transaction, although the parties dispute whether the success fee differed significantly from the calculations set forth in the Engagement Letter.  This fee was comprised of a monetary payment, convertible notes, and warrants that entitled Wellington to future ownership rights in Bleach.  In total, Breakwater paid $168,750 to Wellington, which represented 6.75% of the bridge financing.  (*Id.* ¶ 23)

Bleach never completed the contemplated IPO.  In April 2013, one of Bleach's major suppliers informed Bleach that it had ceased operations.  (*Id.* ¶ 25.)  This supplier further asserted that Bleach owed it money and that Bleach's failure to pay within a specified time would force Bleach into involuntary administration, an Australian process that is equivalent to U.S. bankruptcy. (*Id.* ¶¶ 25, 27.)  Purportedly to safeguard its assets in the face of administration, Bleach subsequently transferred its assets, including those in BGI, into a newly formed Delaware holding company, Bleach Group USA Holdings, Inc. ("BGUHI").  BGUHI was organized on June 17, 2013 and was majority-owned by Bleach's secured creditors, of which Breakwater was the largest. (*Id.* ¶ 38.)  The components of this transaction were consummated in June and July of 2013 (*id.* ¶

3

34), and Bleach ultimately filed for voluntary administration in Australia in or about October 2013 (*id.* ¶ 35).

Breakwater further funded BGUHI through two separate loans, one on July 9, 2013 and the other on April 4, 2014. (*Id.* ¶¶ 42, 44.) While these loans occurred well after the expiration of the Engagement Letter, Wellington alleges that Bleach and Breakwater were discussing these financings while the Engagement Letter was still in effect and that the loans to BGUHI are "a continuation of the bridge financing that [Wellington] provided [Bleach]." (Cabrera Dep. 74:5-74:9.) Neither Bleach nor Breakwater informed Wellington of the development or consummation of these financings.

On September 17, 2014, Wellington filed a Complaint against Defendants. (Doc. No. 1.) In essence, Wellington contends that it is due a success fee on the Breakwater transactions pursuant to its Engagement Letter with Bleach and that Defendants interfered with Plaintiff's "prospective economic relations" by depriving it of "reasonably expected additional business." (*Id.* ¶¶ 58-68.) Accordingly, Wellington brings claims for tortious interference with contract and tortious interference with prospective economic relations, and seeks: (1) judgement against Defendants of $1 million, plus interest and punitive damages; (2) costs; (3) attorneys' fees; and (4) equitable relief. On February 25, 2015, the Court denied Defendants' motion to dismiss. (Doc. No. 31.) After the completion of discovery, Defendants filed this motion for summary judgment (Doc. No. 46), which was fully briefed on September 23, 2015.

## II. LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine

dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party "'show[s]' – that is, point[s] out . . . – that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

III. DISCUSSION

A. Tortious Interference with Contract

Under New York Law, which applies to this case,[2] a tortious interference with contract claim requires that a plaintiff show: "(1) 'the existence of a valid contract between the plaintiff and a third party'; (2) the 'defendant's knowledge of the contract'; (3) the 'defendant's intentional procurement of the third-party's breach of the contract without justification'; (4) 'actual breach of contract'; and (5) 'damages resulting therefrom.'" *CAC Grp., Inc. v. Maxim Grp. LLC*, 523 F. App'x 802, 806 (2d Cir. 2013) (citations omitted).

Even if the Court were to accept that the Engagement Letter created a valid contract between Plaintiff and Bleach – a fact which the parties contest – Plaintiff has failed to satisfy the second, third, and fourth elements of a tortious interference with contract claim. Accordingly, Defendants are entitled to summary judgment on Plaintiff's first cause of action.

1. Defendants' Knowledge of the Contract

In order to meet the second element of a tortious interference with contract claim, it is not sufficient "for a plaintiff to show that a defendant has constructive knowledge of a contract; rather, there must be evidence of *actual* knowledge." *Roche Diagnostics GmbH v. Enzo Biochem, Inc.*, 992 F. Supp. 2d 213, 221 (S.D.N.Y. 2013); *see also Monex Fin. Servs. Ltd. v. Dynamic Currency Conversion, Inc.*, 859 N.Y.S.2d 904, 2008 WL 880209 at *7 (Sup. Ct. Mar. 26, 2008) (citing *Burns Jackson Miller Summit & Spitzer v. Lindner*, 452 N.Y.S.2d 80, 93 (App. Div. 1982) (noting the

---

[2] Given that both parties rely on New York law in their submissions, the Court applies New York law to Plaintiff's claims. *Clarex Ltd. v. Natixis Sec. Am. LLC*, No. 12-cv-7908 (PAE), 2013 WL 2631043, at *2 (S.D.N.Y. June 11, 2013) ("[T]he Court applies New York law for both plaintiffs, because all parties apply New York law in their submissions: Where "[t]he parties' briefs assume that New York law controls . . . such 'implied consent . . . is sufficient to establish choice of law.'" (quoting *Wolfson v. Bruno*, 844 F. Supp. 2d 348, 354 (S.D.N.Y. 2011)); *cf. Celle v. Filipino Reporter Enterp. Inc.*, 209 F.3d 163, 175 (2d Cir. 2000) ("Since no party has challenged the choice of New York . . . law, all are deemed to have consented to its application.").

historical requirement of "actual knowledge on the part of the defendant of the contract's existence" and applying that actual knowledge requirement to tortious interference with business relations)); *AA Tube Testing Co. v. Sohne*, 246 N.Y.S.2d 247, 248 (App. Div. 1964) ("As an essential element of the cause of action sought to be pleaded the plaintiff must allege that the defendants had *actual* knowledge; an allegation that they 'should have known' of the existence of the contract is insufficient."); *Roulette Records, Inc. v. Princess Prod. Corp.*, 224 N.Y.S.2d 204, 207 (App. Div. 1962) (reversing a tortious interference judgment for lack of evidence of "actual knowledge"). Accordingly, to satisfy this element, Plaintiff must show that Defendants had actual knowledge of the terms of the contract and of the contractual obligation that was allegedly breached – in this case, Bleach's exclusivity arrangement with Wellington. *See Medtech Products Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 797 (S.D.N.Y. 2008) (finding "general claim of [a defendant's] knowledge of the contracts" insufficient to show that defendant "was aware of the limitations [the contracts] imposed"); *see also Reach Music Pub., Inc. v. Warner/Chappell Music, Inc.*, No. 09-cv-5580 (KBF), 2014 WL 5861984, at *10 (S.D.N.Y. Nov. 10, 2014) ("Even though knowledge of the contract need not be perfect, [interfering party] must have knowledge of the covenant not to sue in order to be liable for helping [breaching party] violate that particular contractual provision.").

Here, Plaintiff points to no evidence demonstrating that Defendants had *actual* knowledge of the existence of the Engagement Letter, let alone of its terms. *See Roche Diagnostics GmbH*, 992 F. Supp. 2d at 221 (the fact that a contract was published in quarterly filing "is inadequate to demonstrate Roche's knowledge for purposes of tortious interference"). Plaintiff cites various statements from depositions that show Breakwater typically conducts due diligence before undertaking a transaction (*see, e.g.*, Mansour Dep. at 34:6-15), as well as a few communications

that indicate that Breakwater was generally aware that Plaintiff was entitled to a success fee in the event of a bridge financing (Green Decl., Exs. D & G).   However, the best evidence identified by Plaintiff is an e-mail message from Bleach's President to Mansour providing him with authority "to remit US$168,750 success fee . . . as per the Wellington Shields / Bleach Pty Ltd engagement terms and conditions."  (Green Decl., Ex. G.)  Although this letter indicates that Defendants may have had some knowledge of an agreement between Plaintiff and Bleach with respect to the success fee, it does not directly refer to the Engagement Letter and it does not show actual knowledge on the part of Breakwater about the contract, much less its terms.

Significantly, Plaintiff offers no evidence showing that Defendants knew of Wellington's Engagement Letter with Bleach to provide bridge financing or that it included an exclusive right over subsequent transactions.  Indeed, Plaintiff provides no citation to the record for its conclusory statement that "clearly Defendants had reviewed the Engagement Agreement and had actual knowledge that Wellington Shields was entitled to its exclusive right provided for by the Engagement Agreement."  (Pl. Opp. at 15.)  Citing to two articles that state that exclusivity is important to investment banks, Plaintiff attempts to argue that Defendants must have known of the exclusive relationship because of "the high probability" of such an arrangement in the "investment banking industry."  (*Id.*)  However, industry practice is not sufficient to show actual knowledge – and Plaintiff has not even demonstrated that exclusivity is the industry practice.  *See Medtech Prods. Inc.*, 596 F. Supp. 2d at 814 (rejecting argument that a defendant was a "'sophisticated entity' familiar with the concept of confidentiality agreements" as "mere speculation unsupported by the specific allegations of actual knowledge necessary to survive a motion to dismiss a claim of tortious interference with contractual relations").  Accordingly, as Plaintiff has not identified a single piece of evidence in the record demonstrating that Defendants had actual knowledge of the

contents of the Engagement Letter, Plaintiff has not met the second element of a tortious interference claim.

### 2.   Intentional Procurement of the Third Party's Breach of the Contract Without Justification

With respect to the third element of a tortious interference with contract claim – the defendants' intentional procurement of the third party's breach without justification – "it is not enough that a defendant engaged in conduct with a third-party that happened to constitute a breach of the third-party's contract with the plaintiff; instead, the evidence must show that the defendant's *objective* was to procure such a breach." *Roche Diagnostics GmbH*, 992 F. Supp. 2d at 221 (emphasis added); *see also High Falls Brewing Co., LLC v. Boston Beer Corp.*, 513 F. App'x. 12, 13 (2d Cir. 2013) (citing *White Plains Coat & Apron Co. v. Cintas Corp.,* 8 N.Y.3d 422 (2007)). Accordingly, a plaintiff must show that a defendant specifically intended to interfere with the relevant contract. *Am. Cyanamid Co. v. Elizabeth Arden Sales Corp.*, 331 F. Supp. 597, 608 (S.D.N.Y. 1971) (citing *Lamb v. S. Cheney & Son*, 227 N.Y. 418 (1920)).

Once again, there is no evidence in the record to suggest that Defendants intentionally interfered with Plaintiff's contract with Bleach.  Significantly, Plaintiff did not even seek to take depositions from Bleach's principals or other secured creditors, leaving the testimony of Breakwater's employees uncontested in the record.  (Def. Mem. at 2.)  Nevertheless, Plaintiff asks the Court to infer that Defendants' conduct – specifically, Defendants' financing of additional loans to BGUHI without communicating with Plaintiff – shows that Defendants sought "an opportunity to benefit themselves, and gain further control."  (Pl. Opp. at 18.)  However, this argument essentially concedes that Defendants' objective was to protect Breakwater's own investments, not to procure a breach of contract or to interfere with Bleach's relationship with Wellington. *See Masefield AG v. Colonial Oil Indus.*, No. 05-cv-2231 (PKL), 2006 WL 346178,

at *7 (S.D.N.Y. Feb. 15, 2006) ("[C]ourts in this jurisdiction have continued to recognize the defense of economic self-interest in an action for tortious interference with contract."). And while it may be true that Breakwater's subsequent loans allowed it to gain additional control over BGUHI, that fact is irrelevant to the issue of whether Defendants intentionally sought to procure a breach of Plaintiff's contract with Bleach. *See High Falls Brewing Co.*, 513 F. App'x at 13 (holding that allegations that a defendant stood to benefit from a breach of contract are insufficient to show intentional interference). Put simply, there is no evidence in the record indicating that Defendants acted intentionally to cause a breach of contract between Wellington and Bleach.

To the extent Plaintiff argues that Defendants "induce[d] Bleach to enter into the Voluntary Administration" in an effort to cause a breach of contract, this argument also fails. (Doc. No. 1, Complaint ¶ 38.) While a defendant's actions may facilitate a third party entering bankruptcy, the Second Circuit has held that unless a plaintiff can show that a defendant was intentionally trying to interfere with its contracts with that third party, it cannot succeed on its claim. *G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 767-68 (2d Cir. 1995). The mere fact that a defendant benefits economically from a third party's bankruptcy is not enough. *Id.* (finding allegations that defendant forced company into bankruptcy to reacquire its assets without assuming the company's contracts insufficient to show intentional interference with those contracts). Additionally, a company's decision to "wind down" the affairs of an affiliated entity for legitimate business reasons does not constitute tortious interference with a plaintiff's contract with that affiliated entity. *Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 63 (2d Cir. 1988). Accordingly, the fact that Defendants may have somehow benefitted from Bleach entering administration is not sufficient to show that Defendants intentionally interfered with Bleach's contract with Wellington.

In disputing this point, Plaintiff relies almost entirely on *A.S. Rampell, Inc. v. Hyster Co.*, 3 N.Y.2d 369, 370 (1957), a case that is inapposite here. *Rampell* – which is almost sixty years old – involved a relationship of trust between the plaintiff, a dealer-distributor of trucks and cranes, and the defendant, a manufacturer of those products with whom plaintiff frequently did business. In finding that the plaintiff had sufficiently stated a cause of action for tortious interference with contractual relations, the court emphasized that "[a]bsent the relation of confidence between the parties, the complaint would not state facts sufficient to constitute a cause of action." *Id.* at 376. Here, there is no relationship of trust between the parties, and Plaintiff's arguments to the contrary are unconvincing. Plaintiff points to the "substantial resources" invested by Plaintiff to "build its relationship" with Bleach and notes that "Defendants benefitted from Wellington expenditure of resources." (Pl. Opp. at 21.) However, these facts alone are not sufficient to establish the existence of any relationship of confidence between Plaintiff and Defendants. At most, they show a relationship between Plaintiff and *Bleach*. Accordingly, given the factual differences in this case and the lack of a relationship of trust between Plaintiff and Defendants, Plaintiff's reliance on *Rampell* is misplaced.

In sum, Plaintiff asks the Court to make inferences that Defendants' actions with Bleach were intended to interfere with the Engagement Letter. However, Plaintiff's argument has neither legal nor factual support, as there is absolutely no evidence that Breakwater had any intent to interfere with Wellington and Bleach's contract. Accordingly, Plaintiff has not satisfied the third element of a tortious interference with contract claim.

### 3. Actual Breach of Contract

Finally, even if the Court were to accept that the Engagement Letter created a binding contract between Wellington and Bleach, the evidence in the record does not show that Bleach

breached that contract, as required by the fourth element of a tortious interference with contract claim.

According to Plaintiff, Defendants' financing of BGUHI without paying a fee to Wellington constituted a breach of the contract between Wellington and Bleach. However, Plaintiff conveniently overlooks the fact that Bleach and BGUHI are distinct entities and that BGUHI was not a party to any contract with Wellington. "Under New York Law, 'a parent corporation and its subsidiaries are regarded as legally distinct entities and a contract under the corporate name of one is not treated as both.'" *Analect LLC v. Fifth Third Bancorp*, 380 F. App'x 54, 56 (2d Cir. 2010) (citation omitted). Generally, non-named affiliates are not bound to contracts with third parties. *RSL Commc'ns, PLC v. Bildirici*, No. 04-cv-5217 (RJS), 2010 WL 846551, at *1 (S.D.N.Y. Mar. 5, 2010). Moreover, the fact that the Engagement Letter did not account for the possibility of future affiliates does not result in the insertion of these future entities into the contract. *See Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 247-48 (2014) ("EMI's corporate reconfiguration did not … avoid the understanding of the parties. Rather the parties merely did not account for the possibility that the publisher would eventually affiliate with foreign subpublishers." (citation and internal quotation marks omitted)).

Here, Bleach and BGUHI are affiliated but distinct entities. Accordingly, BGUHI is not bound to Bleach's contracts. Obviously, Wellington and Bleach *could have* contracted for broader contractual language that would have included all of Bleach's subsidiaries and affiliates, but they did not do so. Nor is it enough for Plaintiff to state that "it was contemplated by the parties to the Contract that the public offering subject of the Contract would involve the transfer of assets of Bleach Pty." (Pl. Opp. at 13.) To support this statement, Plaintiff points to language in the contract discussing "corporate financing transactions" and "corporate restructuring transactions" to argue

that BGUHI was a continuation of Bleach.  (*Id.* at 12.)  However, these vague statements do not evince an intent to bind BGUHI, or any other Bleach affiliates, to the terms of the Engagement Letter.  As noted above, BGUHI was a holding company entirely separate from Bleach and it was primarily owned by BGI's secured creditors.  Since the Engagement Letter does not provide for the inclusion of future affiliates like BGUHI, the Court will not now rewrite the Engagement Letter's contractual terms to provide a windfall to Plaintiff.  *See Ellington*, 24 N.Y.3d at 247-48. Accordingly, Plaintiff has failed to show a breach of contract by Bleach, the party to the contract with which Defendants allegedly interfered.

Because Plaintiff has failed to prove at least three of the five elements of a tortious interference with contract claim, the Court finds that Defendants are entitled to summary judgment on that cause of action.

### B.   Tortious Interference with Business Relations

A tortious interference with prospective economic relations claim, more commonly referred to as tortious interference with business relations, *see Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006), has elements similar to those of a tortious interference with contract claim, although such a claim is more demanding with respect to the "wrongfulness" of the defendant's interference.  Under New York law, a plaintiff bringing a claim of tortious interference must prove that:  "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008).  Although Plaintiff here can show that it had business relations with Bleach based on the Engagement Letter,

there is simply no evidence in the record to suggest that Defendants acted intentionally to interfere with Plaintiff's business relations with Bleach, much less that they did so using wrongful means.

New York law requires that a plaintiff bringing a claim of tortious interference "demonstrate direct interference with a third party, that is, the defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship with the plaintiff." *Randolph Equities, LLC v. Carbon Capital, Inc.*, 648 F. Supp. 2d 507, 523 (S.D.N.Y. 2009) (quoting *Black Radio Network, Inc. v. NYNEX Corp.*, 96-cv-4138 (DC), 2000 WL 64874, at *4 (S.D.N.Y. Jan. 25, 2000)); *see also Connolly v. Wood-Smith*, No. 11-cv-8801 (DAB) (JCF), 2014 WL 1257909, at *4 (S.D.N.Y. Mar. 27, 2014) ("This cause of action has a 'limited scope.' The defendant's interference must be direct. The defendant must target some activities toward the third party and convince the third party not to enter into a business relationship with the plaintiff." (alteration, citations, and internal quotation marks omitted)).

As discussed above, the record does not support the conclusion that Defendants intentionally interfered with Plaintiff's relationship with Bleach. Put simply, there is no evidence that Defendants did anything to attempt to "convince [Bleach] not to enter into a business relationship" with Plaintiff, or that Breakwater, when it provided the two loans to BGUHI, had any intention of interfering with Plaintiff's relationship with Bleach, especially since it is not clear that Breakwater even *knew* of Plaintiff's contract with Bleach. Accordingly, Plaintiff has not shown that Defendants directly interfered as required in a tortious interference with business relations claim.

With respect to wrongful means, New York law interprets that term narrowly to include "physical violence, fraud, misrepresentation, civil suits, criminal prosecutions and some degree of economic pressure[]." *Snyder v. Sony Music Entm't, Inc.*, 684 N.Y.S.2d 235, 239 (1999).

14

Importantly, "more than simple persuasion is required." *Id.*; *see also Carson Optical, Inc. v. Prym Consumer USA, Inc.*, 11 F. Supp. 3d 317, 337 (E.D.N.Y. 2014) (same). Thus, "[a] cause of action does not lie absent an allegation that the action complained of was motivated solely by malice or to inflict injury by unlawful means rather than by self-interest or other economic considerations." *I.S. Sahni, Inc. v. Scirocco Fin. Grp., Inc.*, No. 04-cv-9251 (RMB) (RLE), 2005 WL 2414762, at *5 (S.D.N.Y. Sept. 28, 2005) (quoting *Kramer v. Pollock-Pollock Found.*, 890 F. Supp. 250, 258 (S.D.N.Y. 1995)). In other words, "to constitute the kind of 'wrongful means' that will support Plaintiff's claim for tortious interference, one of the following must be true: (1) that conduct must amount to an independent crime or tort; (2) that conduct must have been taken solely out of malice; or (3) that conduct must amount to 'extreme and unfair' economic pressure." *Friedman v. Coldwater Creek, Inc.*, 551 F. Supp. 2d 164, 170 (S.D.N.Y. 2008), *aff'd*, 321 F. App'x 58 (2d Cir. 2009). Moreover, the Second Circuit has noted that the "wrongful means requirement makes alleging and proving a tortious interference claim with business relations 'more demanding' than proving a tortious interference with contract claim." *Catskill Dev., L.L.C.*, 547 F.3d at 132 (quoting *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 191 (1980)).

Here, Plaintiff does not identify a single piece of evidence in the record that supports a finding of wrongful means or malice. Plaintiff once again attempts to rely on *Rampell* to argue that Defendants' interference was "dishonest, unfair and improper." (Pl. Opp. at 22.) However, not only is *Rampell* inapplicable to this case, but this conclusory statement, without any factual support, is insufficient to show that Defendants used any wrongful means or that they acted out of malice to interfere with Plaintiff's relationship with Bleach. Rather, as explained above, the record merely reflects that Breakwater issued two loans to BGUHI in an apparent effort to protect its own initial investment. That is not sufficient to establish wrongful means or malice. *See 16 Casa Duse,*

*LLC v. Merkin*, 791 F.3d 247, 262 (2d Cir. 2015) ("When a defendant has acted with a permissible purpose, such as 'normal economic self-interest,' wrongful means have not been shown, even if the defendant was 'indifferent to the [plaintiff's] fate.'" (citation omitted)); *see also Cerberus Capital Mgmt., L.P. v. Snelling & Snelling, Inc.*, No. 60045/05, 2005 WL 4441899, at *7 (N.Y. Sup. Ct. Dec. 19, 2005) ("[T]he complaint contains nothing indicating the . . . defendants acted beyond mere self-interest or other economic considerations.  This is insufficient to support a claim for tortious interference with prospective business relations.").  As such, Plaintiff has not shown that Defendants used any wrongful means that interfered with Plaintiff's relationship with Bleach.

Accordingly, since Plaintiff has failed to satisfy at least two required elements of a tortious interference with business relations claim, this claim also fails, and Defendants are entitled to summary judgment.

## IV. CONCLUSION

For the reasons set forth above, IT IS HEREBY ORDERED THAT Defendants' motion for summary judgment is granted in its entirety.  Accordingly, Plaintiff's Complaint is DISMISSED.  The Clerk of the Court is respectfully directed to terminate the motion located at docket number 46 and to close this case.

SO ORDERED.

Dated:      March 18, 2016
            New York, New York

RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3-18-16